

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-1-2001

# Scully v. US Wats, Inc.

Precedential or Non-Precedential:

Docket 99-1590 & 99-1653

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Scully v. US Wats, Inc." (2001). *2001 Decisions.* Paper 19.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/19

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 1, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-1590 & 99-1653

MARK SCULLY

v.

US WATS, INC.; KEVIN O'HARE,
individually and in his
capacity as President of US WATS;
AARON BROWN, individually and in
his capacity as Chairman of
the Board of Directors of US WA TS;
STEPHEN PARKER, individually and
in his capacity as Executive
Vice-President of US WATS

US WATS, Inc.;
Aaron Brown;
Stephen Parker;

        Appellants in 99-1590

Mark Scully,

        Appellant in 99-1653

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Judge: John P. Fullam
(D.C. Civ. No. 97-04051)

Argued July 10, 2000

Before: SCIRICA, ALITO, and FUENTES, Cir cuit Judges.

(Opinion Filed: February 1, 2001)

Steven M. Coren (argued)
Bruce Bellingham
Kaufman, Coren, Ress &
 Weidman, P.C.
1525 Locust Street
17th Floor
Philadelphia, Pennsylvania 19102
Attorneys for Appellants/
Cross-Appellees
US WATS, Inc., Aaron Brown, and
Stephen Parker

Jonathan D. Wetchler (argued)
Amy Anderson Miraglia
Wolf, Block, Schorr &
 Solis-Cohen LLP
1650 Arch Street
22nd Floor
Philadelphia, Pennsylvania 19103
Attorneys for Appellee/
Cross-Appellant
Mark Scully

OPINION OF THE COURT

FUENTES, Circuit Judge:

In this appeal, the primary issue is whether US W ATS improperly denied Mark Scully the right to exer cise his stock option following his wrongful ter mination, and, if so, whether the District Court, in awarding damages, improperly failed to apply a discount fr om market value to account for the option shares' lack of marketability. In May 1995, US WATS, Inc., a Pennsylvania based telecommunications carrier, hired Mark Scully as president and chief operations officer for a two-year period to implement a financial turnaround of the company. As part of Scully's compensation, US WATS of fered him an option for a substantial amount of restricted shar es which US WATS viewed as exercisable only so long as Scully remained employed by the company. The shares wer e restricted because they could not be transferred for up to one year of

2

the date of their purchase. Although Scully achieved some success in making US WATS profitable, the company terminated him before the end of his two-year employment period and before he could exercise his stock option.

Scully sued US WATS, as well as three of its former officers and directors, Stephen Parker, Aaron Brown, and Kevin O'Hare for breach of contract, conspiracy, fraudulent and negligent misrepresentation and violation of Pennsylvania's Wage Payment and Collection Law ("WPCL").

After a two-day bench trial, the District Court determined that (1) US WATS had wrongfully terminated Scully in violation of a two-year employment contract; (2) US WATS wrongfully deprived Scully of his stock option; (3) Parker and Brown were individually liable under theories of conspiracy or "alter ego"; (4) O'Hare was not liable on any claim; and (5) Scully was not entitled to attorney's fees and liquidated damages under Pennsylvania law. Based on these findings, the District Court awarded Scully damages in the sum of $626,442, which represented the value of Scully's stock option, lost wages, and interest. The parties cross-appeal.

After careful consideration of the numerous issues on appeal, we will affirm the District Court's conclusion that US WATS unlawfully discharged Scully. We will also affirm the determination that US WATS wrongfully deprived Scully of his stock option and the District Court's damages valuation method. However, we will reverse the judgments entered against Parker and Brown because the evidence does not support their individual liability for the actions of the company. Lastly, because we conclude that under state law US WATS's conduct entitles Scully to attorney's fees and may entitle him to liquidated damages, we will remand this issue to the District Court for further proceedings.

I.

In October 1994 Mark Scully entered into a six-month oral consulting agreement with US WATS, a telecommunications company with a principal office in Bala Cynwyd, Pennsylvania. Scully had been hired by defendants Parker and Brown, who founded US WATS in

1989, to achieve a financial turnaround of their company. Scully's consulting services proved so beneficial to US WATS that, in May 1995, Parker and Br own offered him a written contract to serve a two-year term of employment as president and chief operating officer . He declined the written contract, and instead, according to Scully, entered into an oral employment agreement with the company for a similar two-year term.

As an inducement for Scully to remain the full two years, US WATS granted him an option to pur chase 850,000 shares of restricted stock that would vest over a two year period. The option was granted pursuant to a written 1993 Executive Stock Option Agreement ("the Stock Option Agreement"), which was governed by US WATS's 1993 Executive Stock Option Plan ("the Stock Option Plan"). When US WATS hired Scully in May 1995, the Stock Option Plan provided that all options would extinguish upon termination of employment. However, during Scully's term as president, the Stock Option Plan was amended by a 1996 Executive Stock Option Plan to provide that employee options would extinguish 30 days after termination from the company.

Notwithstanding Scully's apparent success in turning US WATS into a profitable company, in December 1996, approximately eighteen months after he began as president, Parker and Brown replaced Scully with Kevin O'Hare. The District Court found that, although Scully would no longer be president, O'Hare, Parker, and Brown promised him "that his continued employment until May 1997 was assured." Scully v. U.S. WA TS, Inc., No. CIV.A. 97–4051, 1999 WL 553474, at *1 (E.D. Pa. July 29, 1999). However, on December 30, 1996, Scully was terminated without warning, effective immediately.

On January 23, 1997, Scully attempted to exer cise his option to purchase 600,000 shares that had vested by that date. US WATS refused to honor the option. Instead, the company claimed that since Scully had been fir ed, his stock option automatically expired. As a result, Scully filed suit against US WATS, Parker, Br own, and O'Hare. Following the trial, the District Court determined that Scully and US WATS had entered into a valid two year employment

4

contract and that "the defendants had no just cause for terminating [Scully's] employment." Id. The Court set forth the reasons for that termination as follows:

> The real reason for the defendants' actions, or at least a principal reason, lay in the fact that the corporation, which was entirely controlled by Messrs. Brown and Parker, had granted more stock options than it could possibly fulfill; and, unless some of the outstanding stock options could be eliminated before December 31, 1996, accurate filings with the SEC would r eveal the true state of the corporation's affairs. Plaintiff 's options to purchase 600,000 of the 850,000 shar es had already vested; and in view of plaintif f 's forthcoming termination in May 1997, and in view of defendants' knowledge that plaintiff would be receiving a substantial sum of money from another investment in January 1997, and would therefore be likely to exercise his options, (which were definitely "in the money") the defendants Brown and Parker carried out their plan to (1) replace plaintiff before the end of 1996, (2) persuade him that he would remain in the company's employ through May 1997, and would therefor e see no need to take immediate action with respect to exer cising his options, and (3) fire him as of December 30, 1996, without advance notice, so that he would be unable to exercise his options before the ter mination of his employment.

Id.

During the trial, the parties presented expert testimony to establish the value of the restricted shar es that US WATS refused to deliver. Following the evidence, the Court opined that "[r]estricted shares ar e generally regarded as subject to a discount from market price, because of the restriction." Scully v. US WA TS, Inc., No. Civ.A. 97–4051, 1999 WL 391495, at *4 (E.D. Pa. June 8, 1999). On this basis, the Court concluded that the appropriate discount would be 30%. Despite this initial observation, the Court ultimately chose not to apply a discount, and instead, based its damage award on the differ ence between the exercise price of the option and the price of unrestricted shares as of the date of the breach. The Court therefore

5

awarded Scully $595,000 in compensatory damages for US WATS's failure to deliver the shares and $31,442 for lost wages. The District Court's jurisdiction was based upon diversity of citizenship. See 28 U.S.C.S 1332(a). We have jurisdiction pursuant to 28 U.S.C. S 1291.

II.

We first address the issue of whether US WATS and Scully had entered into a two-year employment contract. US WATS argues that the District Court's conclusion that there was an oral employment contract is (1) based on insufficient evidence, and (2) contrary to Pennsylvania's presumption of at-will employment. This issue sets forth a mixed question of fact and law. To the extent the issue presented concerns narrative facts, review is for clear error. We extend plenary review to whether the District Court correctly applied the standard for over coming Pennsylvania's presumption in favor of at-will employment. See Ram Constr. Co. v. American States Ins. Co., 749 F.2d 1049, 1052-53 (3d Cir. 1984).

Pennsylvania presumes all employment to be at-will. See, e.g., Geary v. United States Steel Corp., 319 A.2d 174, 176 (Pa. 1974); Scullion v. Emeco Indus., Inc., 580 A.2d 1356, 1358 (Pa. Super. Ct. 1990). This presumption is necessary to prevent baseless assertions of oral employment contracts for a definite term. See Greene v. Oliver Realty, Inc., 526 A.2d 1192, 1198 (Pa. Super. Ct. 1987). However, it is merely a presumption, and courts must be careful in protecting a litigant's right to prove that the parties intended a specific employment period. See id.  The party attempting to overcome the presumption must show clear and precise evidence of an oral employment contract for a definite term. See Gorwara v. AEL Indus., Inc., 784 F. Supp. 239, 242 (E.D. Pa. 1992); Adams v. Budd Co., 583 F. Supp. 711, 713 (E.D. Pa. 1984); Oliver Realty, 526 A.2d at 1202. Evidence of a subjective expectation of a guaranteed employment period, based on employer practices or vague employer superlatives, is insufficient. See Adams, 583 F. Supp. at 713-14; Ross v. Montour R.R. Co., 516 A.2d 29, 32 (Pa. Super. Ct. 1986).

6

Based on the evidence presented, the District Court concluded that Scully and US WATS had entered into a two-year oral employment contract. Scully testified that when he and US WATS entered into the original employment contract, they discussed detailed ter ms of the agreement, or "deal points," including Scully obtaining (1) the same salary as Brown; (2) a car and an apartment at company expense; and (3) the option to pur chase 850,000 shares of stock that would vest over two years. Brown admitted that he had discussed these deal points with Scully. The District Court concluded as follows:

> I accept plaintiff 's testimony on this subject as entirely credible. Both Brown and Parker admitted (1) that they very much wanted plaintiff to stay with the company for two years; (2) plaintiff agreed to stay for two years; (3) they offered plaintiff a written contract for two years, but plaintiff did not feel a written contract was necessary; and (4) the stock options, which admittedly were a key component of the transaction so far as plaintiff was concerned, were exer cisable over a two-year period. The company's stock option plan which was then in effect specified that such options could be exercised only during the continuation of employment by the company; hence, it is quite clear that all concerned contemplated that plaintiff would remain in the company's employ for a two-year period.

Scully, 1999 WL 391495, at *2. The District Court further concluded that:

> both sides had agreed on a two-year ter m of employment. [US WATS] . . . undoubtedly wanted [Scully] to stay for two years, and contemplated that he would do so. [Scully] did not refuse to agree to a two-year term, he simply stated that a written contract was not necessary.

Scully, 1999 WL 553474, at *2.

Because the record supports the District Court's factual findings, we cannot say that the Court clearly err ed.1 As we

_____

1. The District Court found in the alternative that the parties entered into an oral employment contract, for a period of six months, on December 18, 1996. However, as we have alr eady determined that there is sufficient evidence to support the District Court's finding that a two-year oral employment contract existed, we need not address this issue.

7

have recognized, the clearly erroneous standard of review "does not permit an appellate court to substitute its findings for those of the trial court. It allows only an assessment of whether there is enough evidence on the record to support those findings. That a different set of inferences could be drawn from the r ecord is not determinative. It is sufficient that the District Court findings of fact could be reasonably inferr ed from the entire trial record." Knop v. McMahan, 872 F.2d 1132, 1141 (3d Cir. 1989) (quoting In re Consolidated Pretrial Proceedings in Antibiotic Antitrust Actions, 676 F.2d 51, 54 (3d Cir. 1982)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." United States v. Pelullo, 173 F.3d 131, 135 (3d Cir.), cert. denied, 528 U.S. 824 (1999).

In this case, the District Court based its deter mination on the testimony of Scully, US WATS's principals, and the surrounding circumstances. The Court had an opportunity to observe the demeanor and appearance of the witnesses as they testified and to evaluate their believability. In this regard, we observe that "[t]he cr edibility of witnesses is quintessentially the province of the trial court, not the appellate court. `Credibility determinations are the unique province of a fact finder, be it a jury, or a judge sitting without a jury.' Accordingly, we may only r eject a District Court's finding concerning a witness's cr edibility in rare circumstances." Dardovitch v. Haltzman, 190 F.3d 125, 140 (3d Cir. 1999) (quoting United States v. Kole, 164 F.3d 164, 177 (3d Cir. 1998), cert. denied, 526 U.S. 1079 (1999)) (other citations omitted).

Here, the District Court acted within its factfinding authority in determining that US WA TS intended to be bound for a definite employment term. See Scullion, 580 A.2d at 1358-59; Marsh v. Boyle, 530 A.2d 491, 494-95 (Pa. Super. Ct. 1987). We therefor e agree with the Court's conclusion that Scully and US WATS orally consented to a two-year term of employment, and that Scully properly overcame Pennsylvania's presumption of at-will employment.

8

III.

The more difficult issues in this case r elate to Scully's attempted exercise of his stock option and the question of damages. Initially, US WATS contends that the District Court erred in determining that it br eached a contractual duty when it refused to honor Scully's attempt to exercise his option. In its memorandum opinion, the District Court concluded that "plaintiff 's attempted exercise of his stock options on January [23], 1997 was timely and appropriate, and that the defendants wrongfully refused to comply." Scully, 1999 WL 391495, at *3. The Court elaborated on its reasoning as follows:

> Plaintiff 's options were issued originally in accordance with the 1993 stock option plan adopted by the company. Under the terms of that plan, stock options could be exercised only during continued employment. But, since plaintiff 's employment was wrongfully terminated--i.e., since he had a contractual right to continue to be employed on January [23], 1997 --the defendants' breach of that employment contract cannot entitle the defendants to cancel the stock options which were an essential part of that contract of employment.

Id.

We perceive no error. The District Court correctly reasoned that US WATS could not justify rejecting Scully's January 1997 attempt to exercise his stock option by invoking his December 1996 termination fr om employment because Scully's discharge was based on US W ATS's wrongful breach of its employment contract. See Greene v. Safeway Stores, Inc., 210 F.3d 1237, 1243-44 (10th Cir. 2000) (wrongfully discharged executive entitled to damages for unrealized stock option appreciation); Knox v. Microsoft Corp., 962 P.2d 839, 841-43 (Wash. Ct. App. 1998) (employee wrongly terminated in br each of employment contract entitled to damages for cancellation of unvested stock option), review denied, 980 P .2d 1280 (Wash. 1999).

IV.

Having determined that US WATS's wrongful termination improperly denied Scully the right to exer cise his stock

option, we turn to whether the District Court properly valued the stock option in awarding damages. The Stock Option Agreement provides that it is to be interpreted primarily under federal law, and secondarily by New York state law. The parties, however, agree that the applicable law is the same regardless of whether federal, New York, or Pennsylvania law is applied. Therefore, we draw widely from the law in these jurisdictions, as well as other analogous decisions. Our standard of review is plenary because whether the District Court applied the appropriate measure of contract damages is a question of law. W illiam B. Tanner Co. v. WIOO, Inc., 528 F.2d 262, 271 (3d Cir. 1975). After careful consideration of the parties' contrasting approaches, we will affirm the District Court's damage calculation.

We begin our analysis with a brief explanation of executive stock options.

> An executive stock option is a contract between two parties which provides the option purchaser (the executive) the right, but not the obligation, to acquire a firm's common stock at an agreedfixed price for a specified amount of time.

Les Barenbaum, Ph.D. & Walt Schubert, Ph.D., Measuring the Value of Executive Stock Options, 12 No. 12 Fair$hare 3, 3 (December 1992) [hereinafter Measuring the Value]. As observed by commentators, judicial adjudication of stock option controversies is becoming more common due to the widespread use of options as incentives and bonuses.

> Stock options ("call options") allow an employee to buy the employer's stock at a specified future date at a price (the "strike price" [or "exer cise price"]) fixed on the date that the stock is granted. Stock options ar e granted with the expectation that the stock will increase in price during the intervening period, thus allowing the grantee the right to buy the stock significantly below its market price. Traditionally the preserve of corporate executives, stock options are now becoming more widely available to employees throughout a corporation, and may be given as a long-term bonus or incentive, often not vesting for several years into the future.

10

Stock options have become prominent over the past decade, as many Internet "start up" companies typically offer to their employees and applicants the prospect of potentially lucrative stock options in order to recruit and maintain their workforce. Stock options are not only an "incentive" or rewar d to high-ranking or high-performing employees, but also a form of deferred compensation. Indeed, many start-up companies dangle the prospect of lucrative stock options--that can be exercised when the company "goes public"--in order to entice job applicants to join a new company with an unproven track record. Employees who are terminated or constructively discharged usually forfeit their ability to participate in their employer's stock option plans, and may therefore seek judicial relief.

Lynne Bernabei & Alan R. Kabat, Stock Options and Employment Discrimination Law, in 2 Nat'l Employment Lawyers Ass'n, 2000 Eleventh Annual Convention Course Manual at 709-10 (June 21-24, 2000). The Tenth Circuit Court of Appeals has further observed:

The conferring of options on an executive cr eates an incentive for the executive to work hard to increase the market price of the employer's stock because that increases the value of the executive's stock options. Stock options are an increasingly common form of executive compensation. Options are often conferred in the place of more traditional forms of compensation like salary . . . .

Safeway Stores, 210 F.3d at 1243 (citing Susan J. Stabile, Motivating Executives: Does Performance-Based Compensation Positively Affect Managerial Per formance?, 2 U. Pa. J. Lab. & Emp. L. 227 (1999)).

Initially, we note that valuing employee stock options is a complicated enterprise, made more so because, unlike other stock options, employee stock options ar e not publicly traded. Cf. Everett v. Everett, 489 N.W.2d 111, 113 (Mich. Ct. App. 1992) (noting that calculating "the value of stock options[ ] [is] a formidable task given the numerous possible contingencies and restrictions involving stock options"). This is exemplified by the stock option damage calculations

11

presented here, which span the terrain between $180,625 as proposed by US WATS, $531,250 in the District Court's opinion, and $1,078,125 according to Scully.

In this case, the Stock Option Agreement granted Scully the right to purchase 850,000 shares of r estricted stock at $0.75 per share. The restriction pr ovided that, upon exercising the option, Scully would not be able to transfer the stock for a one-year period from the date of the exercise. At the time of his termination in December 1996, Scully's option had vested as to 600,000 shar es. On January 23, 1997, when Scully attempted to exer cise his option for those 600,000 shares, US WA TS's publicly traded stock closed at $1.375 per share. The option to purchase the remaining 250,000 shares vested just over three months later, on May 1, 1997.

The District Court measured damages as of January 23, 1997, the date it determined US WA TS refused to allow Scully to exercise his option. The Court calculated the damages based on the difference between Scully's exercise price (purchase price) of $0.75 per shar e and the $1.375 market price of unrestricted US WA TS stock on that day, or $0.625 per share. The Court applied that calculation to the total 850,000 shares obtainable under the Stock Option Agreement, rather than only to the 600,000 that had vested by January 23, 1997, reasoning that absent his wrongful termination, Scully would have fully exer cised his option after all shares had vested. This method yielded an award of $531,250 ($0.625 x 850,000 shares), plus interest.

Both parties take issue with the District Court's damage calculation. Scully contends that the District Court erred in calculating his damages by reference to the breach of contract date. Scully argues that, instead, his damages should have been calculated as of the end of the r estricted periods because only then could he have sold all the shares. Applying that calculation would benefit him because US WATS's stock increased significantly in value over the relevant time periods. For instance, on January 23, 1998, when the restricted period expir ed for the 600,000 shares Scully would have obtained thr ough his exercise one year earlier, US WA TS's stock closed at $2.00 per share. Had Scully sold the stock on that date, he would

12

have realized a profit of $1.25 per share ($2.00 - $0.75). Thus, Scully seeks damages relating to those 600,000 shares in the sum of $750,000 ($1.25 x 600,000 shares). Scully's remaining option for 250,000 shares of stock did not vest until May 1, 1997. Scully asserts that he could have exercised that option on May 24, 1997, the day after his two-year oral contract of employment expired. Scully's first opportunity to have sold that stock would have been on the first business day after the applicable one-year restricted period expired, which would have been May 26, 1998. On that day, US WATS's stock closed at $2.0625. Had Scully sold his last 250,000 shares then, he would have realized a profit of $1.3125 per share ($2.0625 - $.075). Thus, with respect to the 250,000 shares, Scully claims damages of $328,125 ($1.3125 x 250,000 shares). Accordingly, Scully's total damage claim related to US WATS's refusal to honor his stock option is $1,078,125 ($750,000 + $328,125), plus interest.

By contrast, US WATS argues that, while the District Court's valuation date was proper, the court incorrectly valued the option by failing to apply a discount from fair market value, which was necessary to account for the restricted shares' lack of marketability. See Simon v. Electrospace Corp., 269 N.E.2d 21, 27 (N.Y. 1971) (noting that plaintiff 's damages would be subject to a discount if he were entitled to restricted shares, as opposed to shares that were "freely salable"). In other words, US WATS emphasizes that what Scully lost was an opportunity to obtain less valuable, restricted shares, not more valuable, freely tradable shares. Consequently, US WATS submits that, since the District Court additionally found that the restrictions on marketability would render the restricted stock 30% less valuable, Scully's actual loss from the non-delivery of the stock was $180,625. US WATS calculates this sum by taking the $1.375 market price of unrestricted stock on January 23, 1997 and applying the 30% discount, for a hypothetical market price of $0.9625 for restricted US WATS stock. According to US WATS, Scully lost the difference between the hypothetical market price of US WATS restricted stock and his option exercise price, or $0.2125 per share ($0.9625 - $0.75). Since the District Court correctly assessed liability under a breach of

13

employment contract, pursuant to which Scully was deprived of his ability to purchase all 850,000 shares of restricted stock, US WATS's damage theory would result in an award of $180,625 ($0.2125 x 850,000 shar es), plus interest.

The District Court rejected both of these appr oaches. The Court considered Scully's position unacceptable because it gave him the benefit of hindsight, thereby putting him in a better position than if the breach in employment contract had never occurred. This is so because the period between the breach and the District Court's adjudication revealed to Scully precisely when the market prices of US W ATS stock were at their highest. By the same token, the Court was unwilling to adopt US WATS's position because it deprived Scully of the important advantage he enjoyed pursuant to the option, namely the prospect of reaping a significant profit should the value of the stock rise. The Court considered this result unacceptable because it would essentially reward US WATS for its breach of contract. Moreover, although the Court noted that after the breach Scully could have "covered" by pur chasing the same number of unrestricted stocks on the open market as to which he held an option, he would have had to risk a much larger amount of money, given that on January 23, 1997 the market price for unrestricted US WA TS stock ($1.375) was significantly higher than his option exer cise price ($0.75) for restricted US WATS stock.

In resolving this issue, we concentrate on two competing damages theories upon which the parties have focused: (1) conversion, and (2) breach of contract. Under the conversion theory, damages are intended to compensate a plaintiff for actual loss. Schultz v. Commodity Futures Trading Comm'n, 716 F.2d 136, 139 (2d Cir. 1983); see also Galigher v. Jones, 129 U.S. 193, 200–01 (1889). As presently conceived, conversion damages ar e based on lost profits, which are computed by comparing the plaintiff 's exercise price to (1) the value of the stock at the time of conversion, or (2) the highest intermediate stock price between the notice of conversion and a reasonable time thereafter during which the stock could have been replaced, or whichever is greater. See Schultz , 716 F.2d at 141.

14

Courts have often used this loss theory in cases involving stock because it is particularly germane to goods having fluctuating market values. See id. at 139–40; Clements v. Mueller, 41 F.2d 41, 42 (9th Cir. 1930).

Stocks have also been valued pursuant to a br each of contract theory under which the goal is to put the plaintiff in the same position he would have held had the br each never occurred. Under this approach, the court calculates damages as of the date of the breach. "The proper measure of damages for breach of contract is deter mined by the loss sustained or gain prevented at the time and place of breach. The rule is precisely the same when the breach of contract is nondelivery of shares of stock." Electrospace, 269 N.E.2d at 26 (citations omitted); accor d Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995); Buford v. Wilmington Trust Co., 841 F .2d 51, 55–56 (3d Cir. 1988). Under the contract theory, damages are calculated by taking the difference between a stock option's exercise price and the market price of the same stock at the time of breach. See Hermanowski v. Acton Corp., 580 F. Supp. 140, 146 (E.D.N.Y. 1983), aff 'd in relevant part, 729 F.2d 921 (2d Cir. 1984). This measurement pr oduces the option's "intrinsic value," which is the differ ence between an option's exercise price and the market price for the same stock. See Measuring the Value, at 3.

Both the conversion and contract theories pr esume that a plaintiff has the ability to "cover ," in other words, mitigate damages by protecting prospective pr ofit, by entering the market to purchase the lost shares. However, the theories differ markedly as to when that ability to cover is relevant. The conversion theory extends the cover date to a "reasonable time" into the future, and therefore allows a plaintiff to recover from the defendant some prospective profit that may have accrued after the wr ongful act. In contrast, the contract theory, as most strictly employed in the stock context, puts the onus on a plaintif f to cover immediately upon the breach because damages ar e fixed as of the breach date. Therefore, in the stock context, the contract theory does not allow a plaintiff to recover any prospective profit from the defendant.

15

These differences give each damage theory divergent strengths and weaknesses. The conversion theory allows a plaintiff to recover, to a limited extent, a relevant benefit of his bargain, namely the prospect of future profits which provide the fundamental underpinning to stock options. In this respect, it is an attractive alternative because it does not "reward" a defendant for its wrongful conduct. However, this advantage comes at the price of injecting uncertainty into the damage calculation by, for example, requiring speculation as to the expiration of a reasonable time by which the plaintiff should have covered. Cf. Schultz, 716 F.2d at 140 ("what constitutes a reasonable period between the act complained of and the time when reentry into the market would be both warranted and possible will vary from case to case"). Moreover, the extended cover period may give a plaintiff the improper benefit of hindsight. See Tamari v. Bache & Co. (Lebanon) S.A.L., 838 F.2d 904, 907 (7th Cir. 1988) (conversion theory "is a generous--maybe too generous--measure of damages; it assumes that the customer would have had the clairvoyance to sell when the stock hit its peak during the relevant period, and by so assuming systematically overcompensates defrauded investors").

By comparison, the contract theory will likely lead to a more scrupulous damage calculation because it avoids any uncertainty concerning the amount of future profit or future loss. However, this advantage is achieved at the cost of distorting the damage calculation because it fails to consider the benefit the plaintiff held pursuant to his option, namely a reduced risk of loss and a greater likelihood of profit. This is because the contract theory measures damages by reference to the lost option's intrinsic value. As a general rule, the intrinsic value of an option is lower than its true value, the hypothetical price at which the option would be traded on an open market. "A common misconception in the valuation of executive stock options is that option value is best represented by its intrinsic value." Measuring the Value, at 3-4. The intrinsic value generally fails to reflect the true value because an option holder can, within contractual constraints, wait to exercise his option until the market price for the stock exceeds the exercise price. The holder is thereby able to (1) decrease his risk of

16

incurring a loss, and (2) increase his likelihood of obtaining a future profit. "Options generally sell for more than their intrinsic value because they offer an investor the opportunity to earn large gains if the underlying security goes up in price while, because the option need not be exercised should the underlying security value fall, losses are limited to the cost of the option." Measuring the Value, at 3-4. Thus, the contract theory fails to r ecognize that, even when an option has an intrinsic value of zer o, its true market value will be positive so long as the stock's value has the potential to increase. As an example, under a strict breach of contract approach, where an option's intrinsic value is zero, the plaintiff 's damages will also be zero even though the plaintiff 's lost option may have a positive value. Against this backdrop, it can be said that the contract theory arguably "rewards" a defendant for its breach because, as in this case, it does not compensate the plaintiff for all the benefits he lost when denied the option.

Courts have not taken a consistent approach in computing damages concerning the loss of securities or stock options. For example, several breach of contract cases have measured damages based on the lost option's intrinsic value. See, e.g., Hermanowski, 729 F.2d at 922, aff 'g 580 F. Supp. at 146; Rosen v. Duggan's Distillers Prods. Corp., 256 N.Y.S.2d 950, 951 (App. Div. 1965); see also Richardson v. Richardson , 659 S.W.2d 510, 512-13 (Ark. 1983) (in divorce proceeding necessitating division of property, stock option valued according to intrinsic value).

Other breach of contract cases, however , have avoided the standard contract damage computation. For instance, in one recent decision involving stocks, a District Court held that the failure to honor a contract for the delivery of warrants, which are analogous to stock options, presented a breach of contract claim rather than a conversion. Commonwealth Assocs. v. Palomar Med. Techs., Inc., 982 F. Supp. 205, 211 (S.D.N.Y. 1997). Nevertheless, the Court awarded damages based on a calculation that was more akin to the conversion model, determining the plaintiff 's lost profit by reference to a pr ospective sale of the stock that the plaintiff should have been able to ef fectuate, had the defendant not breached the contract. Id. at 209, 212.

17

Clearly, this was not a strict breach of contract damage computation, which would have limited damages to those calculable on the earlier breach date.2 In another decision which has blurred the distinction between br each of contract and conversion damage theories, the Court held as follows:

> "[T]he measure of damages for the failur e to sell or to deliver stocks and like speculative property, or for the conversion thereof, is the highest market value which the property attains between the time when the contract required its sale or delivery, or the time of its conversion, and the expiration of a reasonable time, to enable the owner to put himself in statu quo, after notice to him of the failure to comply with the contract, or of the conversion."

Clements, 41 F.2d at 42 (quoting McKinley v. Williams, 74 F. 94, 102 (8th Cir. 1896)); see also Schultz, 716 F.2d at 141 (noting in dicta that "[m]any cases" have followed the conversion model "where stock . . . wer e converted, [or] not delivered according to contractual or other legal obligation") (citation omitted); Rauser v. LTV Electr osystems, Inc., 437 F.2d 800, 803–05 (7th Cir. 1971) (in suit brought against former employer for failure to deliver stock option, in which plaintiff asserted breach of stock option agreement, damages calculated using conversion model).

Depending on the circumstances of the case, the blurring between conversion and breach of contract r emedies may be justified. As explained above, the conversion theory allows a plaintiff, who was wrongly denied a stock option, a limited recovery for his lost opportunity to enjoy a reduced risk of loss and a greater likelihood of profit. Because that opportunity constituted part of the benefit of

_____

2. US WATS argues that Palomar offers no support for Scully's position because damages there were calculated as of the date of the breach. That is incorrect. The Palomar Court determined that the breach date occurred in March 1996. Palomar, 982 F. Supp. at 211 ("the relevant breach occurred when defendant failed to honor plaintiff 's request for registration and issuance of the shares in March 1996"). Nonetheless, the Court calculated damages by reference to a June 1996 stock sale that the plaintiff had intended. Id. at 209, 212.

his bargain, providing a remedy for that loss is consistent with a goal of damage awards in the breach of contract setting. See Restatement (Second) of Contracts S 344(a) (1981) ("Judicial remedies under the rules stated in this Restatement serve to protect . . . a pr omisee[`s] . . . `expectation interest,' which is his inter est in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been per formed"); 22 Am. Jur. 2d Damages S 43(a) (1988) (same).

Indeed, given the myriad factors that might arise in each case, we doubt that any single universal damage theory could properly value stock options in all situations. Consequently, we agree with the District Court's damage calculation because it properly weighed and balanced the strengths and weaknesses of competing damage calculation methods to achieve the requisite end of putting Scully in the position most closely reflecting the one he would have held absent US WATS's breach.

In this case, the District Court adhered to the general breach of contract rule by calculating damages as of the date of breach. The Court's decision is consistent with the view that a failure to deliver securities or stock options, pursuant to a legally binding agreement, constitutes a breach of contract. See Palomar, 982 F . Supp. at 211; Hermanowski, 580 F. Supp. at 145; Electrospace, 269 N.E.2d at 26; see also Buford, 841 F .2d at 55–56; Knox, 962 P.2d at 841 (approving application of general contract principles to wrongful termination claim brought by former employee seeking damages for lost stock option).

Further, by relying on the breach date, and thereby measuring damages as of the one date in the r ecord when Scully was clearly willing to risk capital, the District Court avoided the speculativeness and hindsight pr oblems attendant to the conversion theory. Thus, we r eject Scully's argument that the District Court should have measured his damages as of the expiration of the restricted holding periods. Not only is his approach contrary to the general rule that damages for a breach of contract ar e determined on the breach date, it is unduly speculative because it presumes that the shares would be sold immediately at the end of the restricted period, which further pr esumes that

19

the stock will have the same or a higher value on the first date it can be sold as compared to the price at which it was bought. Therefore, in the absence of a district court's express credibility finding or other convincing evidence, we cannot accept a plaintiff 's after-the-fact assertion that he would have sold stock at a time that, in hindsight, would have been particularly advantageous.[3] Were Scully's approach accepted, he would receive mor e than the benefit of his bargain because the stock option mer ely (1) reduced his risk of incurring a loss, and (2) incr eased the likelihood that he would reap a profit. However , the stock option neither extinguished all risk, nor guaranteed a pr ofit.

In addition, Scully's assertion that damages should be calculated as of the end of the restricted period would be particularly problematic in cases where the restricted period ended after trial. Such a problem could occur with a five- or perhaps even a two-year r estriction period. This problem intensifies as the end of the r estricted period moves farther into the future because the vagaries of the stock market render valuation of the security interest more speculative.

Just as we approve the District's Court's use of the breach date for calculating damages, we also approve of the

_____

3. The District Court's ruling expressed an unwillingness to simply accept Scully's position concerning the dates he would have sold the shares had US WATS delivered them. Moreover, this is not a case where adequate evidence confirmed a plaintif f 's professed intent concerning the exercise of security interests. Cf. Safeway Stores, 210 F.3d at 1243 (plaintiff 's assertion that he would have exercised stock option later than his wrongful termination forced him to, which would have significantly increased his profit, confirmed by his planned retirement date); Kers & Co. v. ATC Communications Group, Inc. , 9 F. Supp. 2d 1267, 1271 (D. Kan. 1998) (partnership's contention that, absent defendant's wrongful conduct, it would have sold shares during significantly profitable time frame confirmed by evidence that its trustees, before benefitting from hindsight, had "explicitly agreed" to sell stock at first opportunity); Palomar, 982 F. Supp. at 207, 209 (fir m's assertion, which benefitted from hindsight, that it would have sold stock during a particularly advantageous period was confirmed by thefirm's demonstrable need at the time to quickly raise cash in order to satisfy two impending financial obligations).

20

District Court's valuation method because both of these aspects of the District Court's formula wer e designed to put Scully in the position most closely reflecting the one he would have held absent US WATS's br each of contract. See Knox, 962 P.2d at 841 (damages in a wr ongful termination case are intended to put former employee"into as good a position pecuniarily as he would have been had the contract been performed"). Absent the breach, and consistent with the District Court's findings, Scully would have obtained 850,000 shares of US WA TS stock at $0.75 per share by risking a total of $637,500 ($0.75 x 850,000 shares). The District Court's damage calculation came close to achieving this result because it placed on US WATS the added risk, caused by its breach, of obtaining the same number of shares on the open market, the only r emaining source for the shares. The Court did so by taking the $0.625 difference between the $1.375 market price for unrestricted shares and Scully's $0.75 exercise price to obtain restricted shares, and multiplying that difference by 850,000 shares for an award of $531,250.

US WATS protests, on several gr ounds, the District Court's failure to apply a 30% discount to the $1.375 market price of unrestricted stock. First, we r eject US WATS's contention that the District Court was necessarily obligated to apply the 30% discount to the $1.375 share price of unrestricted stock on January 23, 1997 in order to account for the lower value of the restricted stock. There is some validity to the point that the hypothetical value of similarly restricted US WATS stock selling on the open market would have been lower than the value of the non-restricted stock in order to account for the decreased marketability. See Sowell v. Butcher & Singer , Inc., 926 F.2d 289, 300 (3d Cir. 1991) (an unregister ed stock's lack of transferability "will have an impact on its value"); see also Hagerman v. Yukon Energy Corp. , 839 F.2d 407, 412-13 (8th Cir. 1998) (recounting evidence that decreased marketability reduces unregistered stock's market value); Eastern Serv. Corp. v. Comm'r of Inter nal Revenue, 650 F.2d 379, 383-84 (2d Cir. 1981) (explaining that r estricted securities are subject to a discount to objectively determine hypothetical fair market value if they were traded on an open market); Rochez Bros., Inc. v. Rhoades, 527 F.2d 891,

894–95 (3d Cir. 1975) (remanding for evidentiary proceedings to determine proper discount to apply to restricted stock).

Nonetheless, we find no fault in the District Court's decision not to apply the 30% discount. If the District Court had applied the discount to all 850,000 shar es, as of the date of breach, it would have calculated Scully's damages using the intrinsic value of his option, resulting in a $180,625 award.4 This clearly would have undervalued Scully's loss because intrinsic value, which does not account for an option's reduced risk of loss and increased likelihood of profit, generally understates an option's true value. Although the District Court's damage calculation disregards the restricted period applicable to Scully's shares by omitting the discount, we think the Court's approach was warranted. Therefore, we agree with the District Court's determination that application of a discount was not necessarily a reasonable method of calculating damages. See Palomar, 982 F. Supp. at 212 (refusing to limit plaintiff 's damages on a cover theory because covering would have added to plaintiff 's risk).

Second, we reject US WATS's contention that Scully was not entitled to any damages beyond that computed using the discount unless he actually covered by entering the market to mitigate his losses. At oral argument, US WATS posited that it would have been enough for Scully to risk only the $637,500 that he would have had to pay pursuant to his option. We disagree with this ar gument for two reasons.

As an initial matter, the cover/mitigation principle does not actually require plaintiffs to enter the market. Schultz,

_____

4. The $180,625 figure is computed by applying the 30% discount to the $1.375 market price of US WATS unr estricted stock on January 23, 1997. The result, $0.9625 ($1.375 x 30%), would represent the hypothetical market value of US WATS stock having the same one year holding restriction applicable to Scully's option. The difference between that market value and Scully's exercise price for the same stock results in the option's intrinsic value of $0.2125 ($0.9625 – $0.75), which leads to a total intrinsic value damage award of $180,625 for all 850,000 shares ($0.2125 x 850,000 shares).

22

716 F.2d at 140. It is merely a method of establishing "the outer time limit of a reasonable period during which the highest intermediate value of the lost stock[can] be ascertained. . . . [B]ut the injured party is not actually required to reenter the market in or der to determine when he might have done so." Id. Further , requiring actual reentry would improperly increase the risk to which a plaintiff was exposed since such a rule would not account for possibly unfavorable market conditions, which"would frustrate the rule which seeks to make an investor whole." Id.

Moreover, US WATS ignor es that its suggested approach would necessarily deprive Scully of some part of the advantage, either the decreased risk or the potential profit, that he held pursuant to his option. If, after US W ATS refused to deliver the shares, Scully had chosen to obtain the full 850,000 shares, he would have had to risk much more money than he would have risked in exer cising his option, specifically $1,168,750 ($1.375 x 850,000 shares) as compared to the $637,500 he had to risk under his option for the same number of shares. Thus, he would have been risking an additional $531,250 ($1,168,750 – $637,500), in an attempt to preserve his ability to obtain the same potential profit. Similarly, if he had chosen to equalize his risk by spending only $637,500 on the open market, he would have obtained less than 850,000 shares because the purchase price would have been $1.375 rather than $0.75 per share. Thus, he would have been at a disadvantage in terms of potential profit since that profit would have been for less than the full 850,000 shar es to which he had a right under the option.

The District Court rejected Scully's damage computation and US WATS's discount approach because "they did not reflect the realities of the situation." Scully, 1999 WL 553474, at *5. Numerous decisions have agr eed with the principle that damage calculations should reflect economic reality. See Palomar, 982 F. Supp. at 210 (rejecting damage computation in stock case as "unrealistic"); Electrospace, 269 N.E.2d at 27 (reaching damage award in stock case by "[l]ooking to the economic realities and eschewing legalisms or verbalisms"). Accordingly, we agr ee with the District

23

Court's decision to ignore the restricted period, to refuse to apply the discount, and to award Scully damages for his lost opportunity.

Undoubtedly, the District Court's damage calculation was to some extent imprecise. But so were the calculations that Scully and US WATS advocated. Importantly, we are satisfied that, in the circumstances pr esented, the District Court's damage calculation with respect to the stock option adequately puts Scully in a position most closely r eflecting the one he would have occupied absent US WA TS's breach. "[T]he law does not command mathematical pr eciseness from the evidence in finding damages." Rochez, 527 F.2d at 895. Instead, all that is required is that "sufficient facts . . . be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture." Id.; accord Indu Craft, 47 F.3d at 496 (damages for breach of contract need only be proved with "reasonable certainty").

> In assessing damages, particularly for lost pr ofits, we
> recognize the inevitability of some impr ecision in the
> proof, and note that certainty as to the amount of
> damages is not required, particularly when it is the
> defendant's breach that has made such impr ecision
> unavoidable.

Palomar, 982 F. Supp. at 208.

V.

We now turn to the issue of individual liability. The District Court found that Parker and Brown wer e individually liable based on alternate theories of "alter ego" responsibility and civil conspiracy. As we explain below in separately addressing each theory, we believe that neither one was properly invoked.

A.

US WATS asserts that imposing liability on "alter ego" grounds is legal error because plaintif fs never raised that theory at trial. We agree. This Court has stated that "[t]he fundamental proposition which probably no one would dispute is that a court's power is judicial only, not

24

administrative nor investigative. A judgment may only be properly given for something raised in the course of a litigation between the parties." Webster Eisenlohr, Inc. v. Kalodner, 145 F.2d 316, 318 (3d Cir . 1944); see also Reynolds v. Stockton, 140 U.S. 254, 265–66, 268–69 (1891). This right derives not only from the pr oper role of an Article III court but also from due process pr otections. "The core of due process is the right to notice and a meaningful opportunity to be heard." LaChance v. Erickson, 522 U.S. 262, 266 (1997); accord Reynolds, 140 U.S. at 268–69.

A review of the complaint shows that plaintif fs never raised an alter ego liability theory in the initial pleadings or at any point during pretrial proceedings. The trial transcript indicates only one instance where the issue is raised, a mere inference where the District Court asked whether US WATS abided by corporate for malities. In its opinion, the Court predicated alter ego liability only on its finding that US WATS did not observe corporate formalities. It is apparent from the recor d that plaintiffs did not properly present this issue to the Court, and thus US WATS had no opportunity to present a defense. Thus, the District Court's alter ego ruling cannot stand.

B.

By contrast, Scully pleaded the civil conspiracy theory in his complaint and therefore US WA TS, Parker, and Brown were on notice of the claim. Under Pennsylvania law, a plaintiff must show that " `two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.' " Doe v. Kohn, Nast & Graf, P.C., 862 F. Supp. 1310, 1328 (E.D. Pa. 1994) (quoting Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)). This showing "may be proved by acts and circumstances sufficient to warrant an infer ence that the unlawful combination had been in point of fact for med for the purpose charged. While conspiracy may be proved by circumstantial evidence, the evidence must be full, clear and satisfactory. . . . Mere suspicion or the possibility of guilty connection is not sufficient, nor pr oof of acts which are equally consistent with innocence." Fife v. Great Atl. & Pac. Tea Co., 52 A.2d 24, 27 (Pa. 1947) (citations omitted).

25

Under this standard, the record does not support a finding of civil conspiracy. The District Court stated as its basis for civil conspiracy liability that "it is clear that [Parker and Brown] conspired to cheat the plaintiff of the fruits of his employment and the `turnar ound' success he had achieved for them." Scully, 1999 WL 553474, at *2. While a review of the record shows support for the proposition that Brown was indeed inter ested in ousting Scully for devious reasons, neither the District Court, the parties, nor our own review of the recor d have revealed any evidence proving that Parker agreed to wr ongfully terminate Scully's employment in order to avoid the exer cise of his stock option. For instance, Parker testified that the decision to terminate Scully had been befor e Parker was informed of it. This indirect involvement is reinforced by evidence that Parker's last day of work was two weeks before Scully's termination. At that point, Parker had vacated his office and was preparing to withdraw entirely from the business. The absence of evidence that Parker participated in a plot to terminate Scully pr ecludes our finding the active involvement or collaboration of at least two people. Therefore, we will reverse the holding of civil conspiracy.

VI.

Scully next appeals the District Court's ruling that US WATS did not violate Pennsylvania's WPCL when it refused to allow him to exercise his stock option after his termination. Legal interpretations of the WPCL constitute questions of law subject to our plenary review. Cf. Voest–Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 211 (3d Cir. 1990). Scully invokes the WPCL in an effort to obtain the attorney's fees and liquidated damages that Pennsylvania law authorizes. See 43 Pa. Stat. Ann. SS 260.9a(f), 260.10 (1992).

The District Court determined that US W ATS had not violated the WPCL because the stock option mer ely constituted potential future, not earned, compensation. In other words, the District Court analogized the stock option to salary -- just as Scully would have no WPCL claim for unearned salary payments that post-dated his termination,

26

the District Court reasoned that he had no WPCL claim in exercising the stock option after the date of his discharge. We agree with the general proposition that the WPCL does not give rise to claims for unearned compensation. Numerous decisions have held that the WPCL does not create a new right to compensation, but rather , merely establishes a right to enforce payment of wages and compensation that the employer has legally obligated itself to pay. See, e.g., Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990); Harding v. Duquesne Light Co., 882 F. Supp. 422, 427–28 (W.D. Pa. 1995); Doe v. Kohn, Nast & Graf, P.C., 862 F. Supp. 1310, 1325 (E.D. Pa. 1994); Sendi v. NCR Comten, Inc., 619 F. Supp. 1577, 1579 (E.D. Pa. 1985). We differ with the District Court in that, based on its factual findings, we believe Scully's stock option constituted earned compensation.

The WPCL provides a statutory remedy to employees whose former employers fail to timely pay ear ned compensation. The WPCL states in relevant part:

> [w]henever an employer separates an employe[e] from the payroll . . . the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

43 Pa. Stat. Ann. S 260.5(a) (1992) (emphasis added).

As an initial matter, we are confident that the Pennsylvania Supreme Court would conclude that the stock option granted to Scully, essentially a call option, constitutes "wages or compensation" within the meaning of the WPCL. The WPCL defines wages as including:

> all earnings of an employe[e], r egardless of whether determined on time, task, piece, commission or other method of calculation. The term "wages" also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employe[e]s' pay by the employer.

43 Pa. Stat. Ann. S 260.2a (1992) (emphasis added). In turn, "fringe benefits or wage supplements" are defined as including:

27

> all monetary employer payments to provide benefits under any employe[e] benefit plan, as defined in section 3(3) of [ERISA], as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employe[e]s' pay by the employer; and any other amount to be paid pursuant to an agreement to the employe[e], a third party or fund for the benefit of employe[e]s.

Id. (emphasis added) (citation and footnote omitted). The "call" option extended to Scully falls within the definition of fringe benefits or wage supplements because it r epresents an "amount to be paid pursuant to an agreement to the employee."5 See Regier v. R hone-Poulenc Rorer, Inc., No. Civ. A. 93-4821, 1995 WL 395948, at *4-7 (E.D. Pa. June 30, 1005) (WPCL covers call options); Bowers v. NETI Techs., Inc., 690 F. Supp. 349, 353 (E.D. Pa. 1988) (employer's agreement to repurchase stock fr om employee subject to the WPCL).

Concerning the more central issue, a stock option may qualify as earned compensation under the WPCL if the employer specifically agreed to deliver the option as employment compensation. See Keck v. Trifoods Int'l, Inc., No. Civ. A. 96-3016, 1996 WL 665536, *4-5 (E.D. Pa. Nov. 12, 1996); Harding, 882 F. Supp. at 427-29. Scully presents exactly this situation. Stock options provide an incentive to an employee to work to increase the stock's value and thereby benefit the company. See Safeway Stores, 210 F.3d at 1243. The company benefits because

_____

5. Although the District Court assumed that the WPCL covered the stock option, the Court initially opined that the stock option was likely not subject to WPCL protection because the statutory definition of "wages" requires that they be payable by cash and check, "a requirement that cannot very well be applied to stock-options." Scully, 1999 WL 553474, at *3 (relying upon 43 Pa. Stat. Ann. S 260.3(a)). It is true that the WPCL
requires that "[w]ages other than fringe benefits and wage supplements" be payable "in lawful money of the United States or check." 43 Pa. Stat. Ann. S 260.3(a) (1992). However, the second subsection of the same statute, which applies to "[f]ringe benefits or wage supplements," contains no such restriction, instead r equiring merely that employers must pay such compensation within specified time frames. See 43 Pa. Stat. Ann. S 260.3(b) (1992).

28

the stock option lowers the amount of up-front compensation costs that must be paid directly to the employee, but the employee bears a considerable risk since his compensation will not increase unless the stock value increases. See id. Thus, stock options are often termed "contingent compensation." Id. (internal quotations and citation omitted).

Scully and US WATS entered into this precise arrangement. As the District Court noted, "[t]he entire thrust of the overall arrangement between plaintiff and the defendants was that plaintiff's efforts in improving the fortunes of the company would be rewarded on the basis of the company's improved condition as of a year after the exercise of the option." Scully v. US WATS, Inc., No. CIV. A. 97-4051, 1999 WL 592695, at *1 (E.D. Pa. June 10, 1999).

> [I]t is quite apparent that plaintiff's whole purpose in entering into these arrangements was the expectation that, as a result of his efforts, the company would experience a big improvement in its fortunes, and plaintiff would share in that prosperity. Defendants wrongfully deprived plaintiff of that opportunity, and should not be permitted to insist that plaintiff's chance for future profit ended as of January 23, 1997 . . . .

Scully, 1999 WL 553474, at *5.

Under these circumstances, we think it clear that, once Scully entered into the two-year oral employment contract, he needed to do no more to bind US WATS to the stock option. Scully's stock option was thus "earned within the meaning of the WPCL because [he] was not required to render any further services before they vested and became exercisable." Regier, 1995 WL 395948, at *8.

In this matter, we conclude that US WATS violated the WPCL when it discharged Scully while refusing to honor his attempted exercise of his stock option. Because Scully established that US WATS violated the WPCL, the District Court should have awarded him attorney's fees. See 43 Pa. Stat. Ann. S 260.9a(f) (1992) (court "shall, in addition to any judgment awarded to the plaintiff . . . allow costs for reasonable attorneys' fees of any nature to be paid by the

29

defendant") (emphasis added). We ther efore remand to allow the District Court to address the proper amount of those fees.

In addition to attorney's fees, Scully seeks liquidated damages also available under the WPCL. The Act entitles plaintiffs to liquidated damages only when there is "no good faith contest or dispute of any wage claim." 43 Pa. Ann. Stat. S 260.10 (1992). As the District Court has not addressed the liquidated damages issue, we will remand for a specific finding on this question.

VII.

For the foregoing reasons, this Court will affirm the District Court's order in part, reverse in part, and remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit